# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| ESTATE OF ELIZABETH PARAMORE O'NEAL, deceased, ELIZABETH O'NEAL SHANNON, EMMET O'NEAL, II, and EMMET O'NEAL, III, Personal Representatives,<br>Plaintiffs,<br>v.<br><br>UNITED STATES OF AMERICA,<br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION NUMBER:<br>CV-97-J-2189-S |

**ENTERED**

JUL 3 1 2002

## MEMORANDUM OPINION

This case is before the Court on remand from the Court of Appeals for the Eleventh Circuit for further consideration consistent with its opinion in *O'Neal v. United States*, 258 F.3d 1265 (11th Cir. 2001), affirming in part, vacating in part, and remanding with instructions this Court's decision reported at 81 F. Supp. 2d 1205 (N.D. Ala. 1999).

The central issue in this case involves the estate tax deduction by the Estate of Elizabeth P. O'Neal, deceased, ("Mrs. O'Neal's Estate") under 26 U.S.C. § 2053(a)(3) for claims against Mrs. O'Neal's Estate resulting from transferee gift tax and generation-skipping transfer tax liabilities asserted against the children and grandchildren of Elizabeth P. O'Neal ("Mrs. O'Neal") as donees of certain gifts made by Mrs. O'Neal. The Court of Appeals held that for purposes of the deduction, the claims are to be valued as of the date of Mrs. O'Neal's death without regarded to events occurring after her death and remanded this issue with instructions to conduct an evidentiary hearing to value the claims giving rise to the deduction as of the date of Mrs. O'Neal's death. 258 F.3d at 1266, 1275.

FINDINGS OF FACT

The opinion of the Court of Appeals and this Court's original memorandum opinion set forth in detail the facts concerning the gifts made by Mrs. O'Neal, the expiration of the statute of limitations for assessing gift tax, generation-skipping transfer tax and penalties against Mrs. O'Neal for the gifts to her children and grandchildren, and the assertion of transferee tax liabilities against Mrs. O'Neal's children and grandchildren as donees of the gifts. This opinion summarizes relevant facts from those opinions and sets forth additional findings of fact relevant in determining the value of the deduction on remand.[1]

Mrs. O'Neal and her husband, Kirkman O'Neal, ("Mr. O'Neal") made gifts of O'Neal Steel, Inc. ("O'Neal Steel") common stock to their children and grandchildren on November 3, 1987, reported the gifts on timely filed gift tax returns, and paid gift taxes based on the reported values of the gifts. The reported values of the gifts were based upon an amended buy/sell agreement (the "1951 Buy-Sell Agreement") which set option prices for the O'Neal Steel Class A non-voting common stock at $54.00 per share and for the O'Neal Steel Class B voting common stock at $61.00 per share.

Mr. O'Neal died on August 7, 1988. An audit of his estate tax return led to the examination of Mr. and Mrs. O'Neal's 1987 gift tax returns. After the expiration of the statute of limitations for assessing gift tax, generation-skipping transfer tax and penalties against Mr. and Mrs. O'Neal for the 1987 gifts, the IRS asserted that the reported values of

---

[1] The facts in this case are largely undisputed. The parties agreed to a Modified Statement of Facts which was filed with the Court. At the trial of the case, the parties stipulated in open court that the agreed portion of the Modified Statement of Facts (*i.e.*, the statements of facts that neither side disputed) were in the nature of stipulations.

the stock were understated and sought to collect additional gift tax, generation-skipping transfer tax, penalties and interest from Mr. and Mrs. O'Neal's children and grandchildren. Mrs. O'Neal died on July 23, 1994, while the IRS proceedings against her children and grandchildren were pending.

Although the 1951 Buy-Sell Agreement could possibly have established the value of the O'Neal Steel common stock for estate tax purposes, the IRS estate tax attorney examining Mr. and Mrs. O'Neal's 1987 gift tax returns determined that buy-sell agreements are not binding for gift tax purposes. *See* Section 8 of Rev. Rul. 59-60, 1959-1 C.B 237. The IRS then engaged Mitchell Kaye, an outside fee appraiser, to value the gifted stock.

On February 6, 1992, Mr. Kaye issued a valuation report that opined that the November 3, 1987 value of the O'Neal Steel Class A non-voting common stock was $375.00 per share and that the value of the O'Neal Steel Class B voting common stock was $415.00 per share.[2] Based upon Mr. Kaye's valuation report, the IRS issued Notices of Transferee Liability (the "Notices of Liability") to Mrs. O'Neal's children and grandchildren on April 13, 1992, with respect to Mrs. O'Neal's 1987 gifts.[3] The Notices of Liability asserted

---

[2] At the request of the IRS, Mr. Kaye issued a supplemental report on September 2, 1993, reaffirming his February 6, 1992 valuation of the gifted stock and stating that he had considered the impact of the restrictions in the 1951 Buy-Sell Agreement and the effect of "Black Monday" (*i.e.*, the stock market crash that occurred on October 19, 1987) in his original report.

[3] Similar IRS Notices of Liability were issued on the same day to the children and grandchildren with respect to the gifts from Mr. O'Neal. Also, an IRS notice of deficiency with respect to Mr. O'Neal's estate tax return was issued to Mr. O'Neal's estate on April 28, 1992. The notice of deficiency issued to Mr. O'Neal's estate included a finding that increased the value of the adjusted taxable gifts reported on Mr. O'Neal's estate tax return by $12,814,717.00. The increase in Mr. O'Neal's adjusted taxable gifts was also based on

$7,038,677.00 in aggregate transferee tax liability for Mrs. O'Neal's gift tax, $197,651.00 in aggregate transferee tax liability for Mrs. O'Neal's generation-skipping transfer tax and $2,170,898.00 in undervaluation penalties pursuant to 26 U.S.C. § 6660.[4]   The Notices of Liability also asserted that the children and grandchildren were liable for interest as provided by law.

At about the same time as the Notices of Liability were issued, Mrs. O'Neal, her children and grandchildren, and Mr. O'Neal's estate employed attorney David D. Aughtry ("Mr. Aughtry") to represent their common interests with regard to the Notices of Liability.[5]

On July 9, 1992, Mr. Aughtry filed petitions in the United States Tax Court on behalf of Mrs. O'Neal's grandchildren contesting the Notices of Liability (the "Tax Court Cases"). The lead counsel for the litigation team representing the IRS in the Tax Court was IRS District Counsel Attorney Michael T. Breen ("Mr. Breen").   The Tax Court Cases were ongoing when Mrs. O'Neal died.

Mrs. O'Neal's children contested their transferee liability by paying the tax shown on their Notices of Liability, filing claims for refund, and then filing suits for refund in the United States District Court for the Northern District of Alabama.  Answers were filed by the government in the children's suits for refund in June, 1994, that denied the correctness of the

_____

Mr. Kaye's valuation of the O'Neal Steel common stock as of November 3, 1987.

[4]   References herein to 26 U.S.C. § 6660 refer to that section prior to its amendment in 1989.

[5]   Mrs. O'Neal's children and grandchildren were also represented by attorneys Roy J. Crawford and E. T. Brown, Jr.  Mrs. O'Neal and Mr. O'Neal Estate were separately represented by attorney C. Fred Daniels.

-4-

reported values of the gifted stock and asserted that no refund was due to the children. Nothing further happened in the children's refund suits prior to Mrs. O'Neal's death.

The Tax Court Cases were the lead cases challenging the IRS's findings as to the value of the gifted stock and the donees' transferee liability. In these cases, the grandchildren essentially pursued two lines of defense. The first was an argument that the Notices of Liability were untimely due to the IRS's failure to assess gift tax, generation-skipping transfer tax or penalties against the donors. The second defense was that the values of the gifts were correctly reported on the gift tax returns. Mr. Aughtry testified at the trial of this case that he believed that the first defense was the strongest of the two.

The grandchildren obtained a draft valuation study dated March 15, 1992, from the brokerage firm of Sterne, Agee & Leach, Inc. ("Sterne, Agee") that valued both the O'Neal Steel Class A non-voting common stock and O'Neal Steel Class B voting common stock at $182.00 per share as of November 3, 1987. Sterne, Agee revised their draft study on September 14, 1992, to value both the O'Neal Steel Class A non-voting common stock and the O'Neal Steel Class B voting common stock at $178.00 per share. The Sterne, Agee study was not finalized prior to Mrs. O'Neal's death, and neither draft was furnished to the IRS. Mr. Aughtry testified that when Mrs. O'Neal died, he was not planning to use a Sterne, Agee report in the trial of the Tax Court Cases.

The children and grandchildren also obtained marketability opinions from Jefferson Capital Fund, Ltd., Noble Ventures International, and The Breckenridge Group, Inc., who are venture capitalists or investment bankers, not appraisers of closely-held corporate stock.

The marketability opinions indicated that the gifted stock could not be sold for more than the price determined by the 1951 Buy-Sell Agreement.   Mr. Aughtry testified that the marketability opinions were not prepared in accordance with the Uniform Standards of Professional Appraisal Practice.

Eventually, the IRS and the grandchildren filed cross-motions for summary judgment addressing the grandchildren's first line of defense — were the Notices of Liability untimely due to the IRS' failure to assess gift tax, generation-skipping transfer tax and penalties against Mr. and Mrs. O'Neal?  Arguments on these motions were heard by the Tax Court on September 29, 1993.  On April 28, 1994, the Tax Court granted the IRS's motion for partial summary judgment and held that the Notices of Liability were timely and that the grandchildren were liable for the transferee tax liability. *O'Neal v. Commissioner*, 102 T.C. 666 (1994).  The amount of the grandchildren's transferee tax liability was not addressed by the Tax Court at that time.

Thereafter, the grandchildren filed a Motion to Calendar the Tax Court Cases for trial. In June, 1994, slightly more than a month before Mrs. O'Neal's death, the IRS filed a Notice of Objection to the Motion to Calendar the cases stating that it had just hired Martin D. Hanan ("Mr. Hanan") of Business Valuation Services, Inc., to testify as an expert witness in addition to Mr. Kaye.  The grandchildren responded to the hiring of Mr. Hanan by hiring Chris Mercer ("Mr. Mercer") of Mercer Capital to value the gifted stock.[6]  Having just been

---

[6] The government argued in this case that the employment of Mr. Hanan by the IRS and Mr. Mercer by the grandchildren was evidence that the IRS and the taxpayer abandoned their experts prior to Mrs. O'Neal's death.  That is contrary to the evidence.  Mr. Breen testified that the IRS had not abandoned Mr. Kaye as an expert.  The IRS's Notice of

hired, both Mr. Hanan's work and Mr. Mercer's work had just begun when Mrs. O'Neal died.

At the time of Mrs. O'Neal's death, the value of the assets she owned was $5,303,744.00. Mrs. O'Neal's debts at her death totaled $13,124.00, plus the amount that she owed to her children and grandchildren on account of the transferee tax liability.

### PROCEDURAL BACKGROUND

In this case, the Personal Representatives of Mrs. O'Neal's Estate seek a refund of the federal estate taxes and interest paid by Mrs. O'Neal's Estate because the estate is entitled to a deduction for the claims by Mrs. O'Neal's children and grandchildren against Mrs. O'Neal and her estate for the transferee gift tax and generation-skipping transfer tax liabilities, together with penalties and interest asserted against them. Mrs. O'Neal's Estate asserted that the amount of the deduction was the amount that the IRS was seeking from the children and grandchildren when Mrs. O'Neal died. The government asserted that Mrs. O'Neal's Estate was not entitled to a deduction.

Following a hearing on cross-motions for summary judgment filed by the parties, this Court issued its Order and Memorandum Opinion holding that Mrs. O'Neal's Estate is entitled to the deduction but that the amount of the deduction should be based upon the

---

Objection to the Motion to Calendar the Tax Court Cases and the memorandum in support thereof identified Mr. Hanan as a "second expert", not a replacement expert. Mr. Aughtry testified that the grandchildren were not planning to use a Sterne, Agee report and that he was still seeking a valuation report from a qualified expert to counter Mr. Kaye's report and Mr. Hanan's anticipated report.

settlement of the Tax Court Cases, which occurred after Mrs. O'Neal died. 81 F. Supp. 2d at 1226, 1227.

Both the government and Mrs. O'Neal's Estate appealed the decision. The government appealed the issue of whether Mrs. O'Neal's Estate was entitled to any deduction for the children's and grandchildren's claims. The government subsequently moved to dismiss its appeal, however, and its appeal was dismissed with prejudice.

The appeal by Mrs. O'Neal's Estate was based, *inter alia*, upon its contention that this Court should have considered only pre-death events in determining the amount of the deduction and the deduction should be in the amount demanded by the IRS.[7] In opposing the arguments presented by Mrs. O'Neal's Estate on appeal, the government argued that the amount of the deduction should be based upon the post-death settlement.

The Court of Appeals rejected the government's argument and held that the deduction to be taken by Mrs. O'Neal's Estate for the children's and grandchildren's claims against Mrs. O'Neal's Estate is the value of such claims as of the date of Mrs. O'Neal's death, determined without consideration of post-death events. 258 F.3d at 1275. The Court of Appeals plainly held that Mrs. O'Neal's Estate is entitled to a deduction in some amount (clearly not zero). *Id.* at 1271 n.20. The Court of Appeals also stated, however, that the

---

[7] Mrs. O'Neal's Estate also appealed this Court's holding that attorney's fees paid to Mr. Aughtry after Mrs. O'Neal's death are not deductible, holding that fees paid to Mr. Aughtry prior to Mrs. O'Neal's death should be included as assets of her gross estate, and determination of the amount of a deduction for interest expense. The Court of Appeals affirmed this Court's decision with regard to the post-death and pre-death fees paid to Mr. Aughtry. The issue of the deduction for interest expense was remanded to this Court to be determined at the conclusion of this litigation.

value of the deduction is not necessarily the amount that was demanded by the IRS. *Id.* at 1275.

The Court of Appeals then remanded the valuation issue with instructions to hold an evidentiary hearing to value the claims giving rise to the deduction at the date of death. *Id.* at 1276. Events that occurred after Mrs. O'Neal's death that alter value were to be disregarded. The mandate of the Court of Appeals included the following:

> On remand, the district court is instructed neither to admit nor consider evidence of post-death occurrences when determining the date of death value of the Section 2053(a)(3) deduction. [Citation to *Estate of Smith v. Commissioner*, 198 F.3d 515, 526 (5th Cir. 1999).] It will be incumbent on each party to supply the district court with relevant evidence of pre-death facts and occurrences supporting the date-of-death value of the deductions as advocated by that party. *Id.* The district court will then, by using informed judgment, reasonableness and common sense, weighing all relevant facts and evaluating their aggregate significance, determine a sound valuation. *See* Revenue Ruling, 1959-1 C.B. 237, Rev. Rul. 59-60 (1959).

258 F.3d at 1275.

## DISCUSSION

The issue on remand is the value of the deduction as of July 23, 1994, the date of Mrs. O'Neal's death. In support of its contentions as to value, Mrs. O'Neal's Estate established the status of the transferee tax liability proceedings as of the date-of-death through the testimony of Mr. Augthry and the introduction of documents from those proceedings. Mrs. O'Neal's Estate then offered the testimony and reports of two experts who testified as to the value of the children's and grandchildren's claims as of Mrs. O'Neal's death.

The government chose not to offer an expert to assist the Court. Instead, the government sought to establish a timeline of events by cross-examining Mr. Aughtry and the taxpayer's experts, and offering the testimony of Mr. Breen, Mrs. O'Neal's accountant, the IRS estate tax attorney who conducted the tax audit, and an IRS employee who participated in the engagement of Mr. Kaye. However, the government offered no evidence which would transform the timeline of events into admissible evidence of value, which is the question that the Court of Appeals placed before this Court. What this Court needed from the government, and did not receive, was evidence to assist this Court in determining the value of the claims as of Mrs. O'Neal's date of death.[8]

In *Estate of Smith v. Commissioner*, 198 F.3d 515 (5th Cir. 1999), the Fifth Circuit offered the following guidance regarding the type of evidence that assists a court in establishing the date-of-death value of claims against an estate:

> The actual value of Exxon's claim prior to either settlement or entry of a judgment is inherently imprecise, yet "even a disputed claim may have a value to which lawyers who settle cases every day may well testify, fully as measurable as the possible future amounts that may eventually accrue on an uncontested claim." [Footnote citing *Gowetz v. Commissioner*, 320 F.2d 874, 876 (1st Cir. 1963)]
>
> In fact, when addressing situations that are the obverse of the one in the instant case, i.e., when the decedent-estate taxpayer is a plaintiff rather than a defendant in a pending lawsuit, the Commissioner has considered himself capable of determining the value of a pending lawsuit in exact dollars and cents, even when the claim has not been reduced to judgment. [Footnote citing *Estate of Davis v. Commissioner*, 65 T.C.M. (CCH) 2365 (1993)] Furthermore,

---

[8]The Court of Appeals urged the parties to furnish this court with such evidence: "It will be incumbent on <u>each party</u> to supply the district court with relevant evidence of pre-death facts and occurrences supporting the date of death value of the deduction <u>as advocated by that party</u>" (emphasis added). *See O'Neal,* 258 F.3d at 1275.

courts have consistently held that "inexactitude is often a byproduct in estimating <u>claims or assets</u> without an established market and provides no excuse for failing to value the claims . . . in the light of the vicissitudes attending their recovery." [Footnote citing *Estate of Curry v. Commissioner*, 74 T.C. (CCH) 540, 551 (1980)]

*Estate of Smith*, 198 F.3d at 525 (emphasis in original).[9]

Also complicating this case is the fact that the positions of the parties regarding the value of the gifted stock essentially are the reverse of their positions in the litigation regarding the transferee liability. Unlike the transferee litigation, the government in the present case has an incentive to minimize the value of the gifted stock and the children's and grandchildren's transferee liability, while Mrs. O'Neal's Estate has an incentive to maximize the value of the stock and the transferee liability.

As previously stated, Mrs. O'Neal's Estate offered the reports and testimony of two experts, both of whom currently practice as attorneys and one of whom is also a recently retired Federal District Judge. Tax cases valuing legal claims often use attorneys and retired judges as expert witnesses. *See, e.g., Estate of Smith v. Commissioner*, 82 T.C.M. (CCH) 909, 915–916 (2001) (IRS used testimony of a lawyer who had settled and mediated numerous cases involving similar disputes to value claim against estate); *Estate of Davis v. Commissioner*, 65 T.C.M. (CCH) 2365, 2366 (1993) (lawsuit included as asset in estate

---

[9] The taxpayer in *Smith* choose to utilize a similar strategy on remand as the government has followed here and did not offer the report and testimony of an expert to assist the Tax Court in valuing the claim. The Tax Court observed that "the estate . . . has decided not to follow the Court of Appeals's [sic] guidance that 'it is incumbent on each party to supply the Tax Court with relevant evidence of predeath facts and occurrences to support the value of the Exxon claim advocated by that party.'" *Estate of Smith*, 82 T.C.M. (CCH) 909, 914 (2001).

valued by attorney with experience evaluating lawsuits); *Estate of Lennon v. Commissioner*, 62 T.C.M. (CCH) 326, 328 (1991) (retired judge who practiced appellate law following retirement from the bench testified as to value of lawsuit on appeal at death). Indeed, both the First Circuit in *Gowetz v. Commissioner*, 320 F.2d 874 (1st Cir. 1963), and the Fifth Circuit in *Estate of Smith* held that "lawyers who settle cases every day" can testify as to the value of disputed claims. *Gowetz*, 320 F.2d at 876; *Estate of Smith*, 198 F.3d at 525.

Both experts testified as to the date-of-death value of the claims against Mrs. O'Neal based upon the likely outcome of the transferee tax litigation given the facts known as of Mrs. O'Neal's death.[10] Each expert then discounted that value to reflect contingencies related to restitution litigation between Mrs. O'Neal or her estate as donor and her children and grandchildren as donees. Neither expert considered or relied upon events, facts or occurrences after Mrs. O'Neal's death on July 23, 1994.

One of the experts, Sam C. Pointer, Jr. ("Judge Pointer"), is the recently retired Chief Judge of the United States District Court for the Northern District of Alabama, having served as a United States District Court Judge for twenty-nine and one-half years and having extensive experience in taxation and dispute resolution. After law school but prior to going on the bench, Judge Pointer studied at New York University as a Kenneson Fellow where he earned the degree of Masters of Law (in Taxation). Judge Pointer was in private practice for twelve years before being appointed as a District Judge. A substantial part of his practice

---

[10] As stated above, the government offered no expert testimony. As a result, all expert testimony discussed herein refers to experts testifying on behalf of Mrs. O'Neal's Estate.

involved matters related to federal estate and gift taxes — both in estate planning and in the resolution of disputes with the IRS, including disputes related to estate and gift taxes. Several of the tax matters related to the valuation of closely-held businesses. Litigation in his practice included tax litigation.

As a District Judge, Judge Pointer was involved in the resolution (whether by summary disposition, by settlement, or by trial) of thousands of cases. He presided as a judge in tax cases, including cases involving gift or estate taxes. In fact, when Judge Pointer first went on the bench, all of the tax cases in the Northern District of Alabama were assigned to him because of his background in tax law. His cases while on the bench included cases where either he or a jury working with him had the responsibility of valuing closely-held companies.

Judge Pointer returned to the private practice of law in April 2000. A significant portion of his current practice involves the mediation and arbitration of disputes. Judge Pointer is designated as a national panelist by the CPR Institute for Dispute Resolution. He has served as a mediator or arbitrator by court appointment and in disputes administered by JAMS and AAA. In addition to mediation and arbitration, his practice also involves the representation of clients in litigation, both as plaintiffs and as defendants.

The Court finds that Judge Pointer who, having participated in the resolution of innumerable disputes and having exceptional expertise in tax disputes, is qualified to render his opinion as an expert for purposes of this case.

Judge Pointer testified that his assigned task was to value, as of July 23, 1994, the restitution claims that Mrs. O'Neal's children and grandchildren had against Mrs. O'Neal's estate arising out of their liability as transferees for an alleged underpayment of gift taxes (and generation-skipping transfer taxes), penalties, and interest with respect to gifts of O'Neal Steel common stock made by Mrs. O'Neal in November 1987.

Judge Pointer started with an analysis of the children's and grandchildren's transferee tax liability. He determined that there were at least four possible outcomes of the transferee tax litigation: (1) acceptance of the $375.00 per share value of the O'Neal Steel, Inc. Class A non-voting common stock as determined by Mr. Kaye;[11] (2) acceptance of a value at or near the $54.00 per share argued by the transferees; (3) acceptance of a value at or near the $178.00 per share amount set forth in the September 14, 1992 Sterne, Agee report; or (4) a value based on the midpoint between the $54.00 value based on the 1951 Buy-Sell Agreement and the $375.00 value in the Notices of Liability based on Mr. Kaye's valuation report. Because Judge Pointer concluded that there was roughly an equal chance of each of these values being the outcome of the transferee liability litigation, he found a 25% likelihood for each of the four possible outcomes.

Judge Pointer summarized his calculations using the following chart:

---

[11] Judge Pointer's analysis disregarded the potential for a higher value for the O'Neal Steel, Inc. Class B voting common stock since, as a result of the few number of shares and the small potential increased value, an adjustment related to their additional value is *de minimis*.

- a 20% to 30% chance[12] of a per-share value at or near $54
  .25 x $54 =                                                    $  13.50

- a 20% to 30% chance of a per-share value at or near $178
  .25 x $178 =                                                   $  44.50

- a 20% to 30% chance of a per-share value at or near $375
  .25 x $375 =                                                   $  93.75

- a 20% to 30% chance of a per-share value at or near the
  intermediate point between $54 and $375
  .25 x $214.50 =                                                $  53.63

- composite per-share value expectancy                           $205.38

A per-share value of $205.38 results in an expected transferee liability, with penalties

and interest, of approximately $7,780,000.00 as of July 23, 1994.

Judge Pointer next analyzed the likelihood that the children and grandchildren would

prevail under Alabama law with their restitution claims against Mrs. O'Neal or her estate.

Initially, he identified potential defenses to the claims. However, Judge Pointer concluded

that these defenses were not likely to succeed. For those reasons, he assigned a 75%

probability that the children and grandchildren would have been able to establish and enforce

their restitution claims against Mrs. O'Neal or her estate as of July 23, 1994.

Judge Pointer's well-reasoned analysis of the law of restitution and its application to

this case is extremely helpful to the Court, and that portion of his report is hereinafter set out:

> The question is this: what, as of July 1994, was the likelihood of the
> transferees' being able to prevail under Alabama law with restitution claims

---

[12] This outcome includes the possibility of an appellate decision concluding that no transferee liability could be imposed on the transferees because the IRS did not assert a deficiency or challenge the valuation prior to the running of the statute of limitations, a defense that the Tax Court had rejected just a few months before Mrs. O'Neal's death.

against Mrs. O'Neal or her Estate based upon their having to pay taxes, penalties, and interest because she underreported and underpaid the gift taxes due as a result of her 1987 gifts to the transferees.

Faced with such restitution claims, the Estate would have had the following potential defenses to the entirety of the claims: (1) restitution is unwarranted because the transferees were not called upon to pay Mrs. O'Neal's liability under I.R.C.§§ 2502(c) and 2603(a)(3), but rather their own liability under § 6324(b); (2) because of the statute of limitations, Mrs. O'Neal did not in July 1994 have any potential tax liability to the government as a result of her 1987 gifts; (3) in November 1987 it had, in essence, been agreed that the transferees, rather than Mrs. O'Neal, would be responsible for any underpayment of taxes relating to the gifts; and (4) the transferees did not assert any claim against Mrs. O'Neal during the two-year period between the time they were assessed with transferee tax liability and the time of her death. As a partial defense, the Estate might possibly also have contended that any interest accruing after the April 1992 assessment of transferee liability — or at least the excess of the statutory rate over the market rate — should be the sole responsibility of the transferees and not subject to recovery from the Estate. [Footnote: Because of the relatively small impact of this interest and the size of the remainder of the claim in comparison with the size of the probate estate, I doubt that this would have been actively pursued as a defense and accordingly have not separately analyzed the prospect of this limited defense being sustained.]

These potential defenses are not frivolous. Indeed, there is a trial court decision from New Jersey, *Fidelity Union Trust Co. v. Anthony*, 81 A.2d 191 (N.J. Super. Ct. Ch. Div. 1951), which squarely rejected just such a restitution claim.

However, in Alabama and elsewhere, courts in analogous situations have decided cases that support the right of a donee/transferee to maintain a restitution claim against a donor/transferor for unpaid/underpaid gifts taxes. In Illustration 8 to Section 76 of ALI's Restatement of Restitution the reverse of the present case is presented — a restitution claim by an Estate against an heir arising from the heir's failure to pay the full amount of *succession/inheritance* taxes initially imposed on the heir — and the note indicates that the Estate would be entitled to reimbursement. This illustration was based on an 1819 English decision (*Hales v. Freeman*), which under ALA. CODE § 1-3-1 (1975) would have been adopted as part of the law of Alabama. Similarly, restitution was allowed by the highest courts of the states of Pennsylvania and New York for claims brought by the transferor of bank stock

against the transferee relating to amounts the transferor was statutorily required to pay because the transferee failed to pay the statutory assessment. *See Pennsylvania Co. for Insurance on Lives & Granting Annuities v. Clark*, 18 A.2d 807 (Pa. 1941); *Brown v. Rosenbaum*, 41 N.E. 2d 77 (N.Y. 1942).

While there is no Alabama case directly on point, the Supreme Court of Alabama has twice allowed a person, secondarily called upon to pay an obligation primarily owed by another, to obtain reimbursement for payment of that obligation. *See Mitchell v. Conway*, 60 So.2d 676 (Ala. 1952); *Schuessler v. Shelnutt*, 171 So. 259 (Ala. 1936).

The New Jersey trial court in *Fidelity Union* accepted the argument, advanced by the government in the current estate tax litigation, that, as it affects a restitution claim, a transferee's liability under I.R.C. § 6324(b) is independent of, and not secondary to, the obligation of the donor under §§ 2503 and 2603. I believe this is a misreading of the applicable statutes, regulations, and *Mississippi Valley Trust Co. v. Comm'r*, 147 F.2d 186 (8th Cir. 1945), and most likely would be so held by an Alabama court (or by a federal court predicting Alabama law).

Federal gift taxes are excise taxes based on making a gift (not on receiving a gift). These taxes are to be reported and paid by the donor — whether or not the identity of the donee is known or can even be ascertained — and the obligation of a transferee under § 6324(b) arises only if and to the extent the donor fails to pay the applicable taxes. That the transferee's liability is secondary to that of the donor is highlighted by the fact that the amount of a transferee's liability is not based on the calculation of a tax rate applied to the amount of the gift received by the transferee, but indeed (via the imposition of a lien) on the full amount owed by the donor as taxes on all gifts during the year (up to the total value of the gift to the transferee). That the transferees were being called upon to pay the liability of Mrs. O'Neal is reinforced by the fact that they were also being charged with a 30% penalty under I.R.C.§ 6660 for Mrs. O'Neal's undervaluation of the stock in her gift return, something over which they had no control.

That Mrs. O'Neal was not, because of the running of the statute of limitations on an assessment against her, still directly liable to the IRS in 1994 for unpaid gift taxes would, in all likelihood, not have affected her liability (or the liability of her Estate) for a restitution claim brought by the transferees. While claims for indemnification or restitution sometimes are brought — arguably prematurely — before payment of the underlying claim, the law allows the person seeking indemnification or restitution to wait until the

underlying claim is resolved. This is so, even though the indemnification/restitution claim may then be brought after the time would otherwise have run on a direct claim by the underlying claimant against the defendant.

The argument could be made — as has the government in the present case — that the Supplemental Stock Purchase Agreement and Escrow Agreement entered into in November 1987 constituted an agreement that any gift taxes not paid by Mrs. O'Neal would be the responsibility (on a pro rata basis) of the transferees. And, hence, according to this argument, there was an understanding that Mrs. O'Neal (and her estate) would be relieved from further responsibilities for gift taxes.

The fundamental flaw in this argument is that these November 1987 agreements addressed only the issue of an equitable initial sharing *as among the donees* of any transferee liability that might be later assessed against one or more of them, and not the responsibility of Mrs. O'Neal — either to the IRS or to the donees — with respect to payment of the appropriate gift taxes. At the time of these agreements Mrs. O'Neal had not reported or paid any gift taxes on these gifts, and from the fact that five months later, in April 1988, she filed a gift tax return and paid over $800,000 in taxes, it is clear that she and the donees expected her to pay (as the law required) the appropriate taxes.

Finally, there is the argument that, though confronted in April 1992 with a multi-million dollar assessment, the transferees apparently made no restitution claim until Mrs. O'Neal's death in July 1994. [Footnote: The transferees did promptly file a restitution claim against the Estate of Kirkman O'Neal.] This, however, would not have constituted a defense by her Estate to the restitution claims: the statute of limitations (even if it had started running when the transferees received the assessment rather [than] or payment of the liability) would not have expired in July 1994.

As indicated above, I do not consider these potential defenses by the Estate to the transferees' restitution claim to be frivolous. On analysis, however, it is my opinion that they were very unlikely to succeed, and, indeed, that, as of July 1994, the transferees had a 75% probability of being able to establish and enforce their restitution claims against the estate.

Applying this 75% probability to the $7,780,000.00 expected transferee tax liability,

penalties and interest, Judge Pointer concluded that the children's and grandchildren's claims

had a value of $5,835,000.00 as of Mrs. O'Neal's date of death.

The Court finds Judge Pointer's analysis to be adept, thorough and persuasive. His testimony made clear that he approached his task as an unbiased expert, not as an advocate. The Court places great weight on his opinion.

The other expert offered by Mrs. O'Neal's Estate was Harold I. Apolinsky ("Mr. Apolinsky"). Mr. Apolinsky is a practicing attorney. Like Judge Pointer, he attended New York University where he earned the degree of Masters of Law (in Taxation). Mr. Apolinsky's practice focuses on tax planning and tax dispute resolution. He represents clients in the making of gifts of business interests and is called upon to review and comment upon the work of business appraisers. Mr. Apolinsky represents taxpayers before the Internal Revenue Service, the United States Tax Court, the United States District Court, and the Court of Appeals. He has successfully represented taxpayers in tax litigation before the United States Supreme Court. Mr. Apolinsky is experienced in evaluating lawsuits for settlement and for trial, including evaluating tax cases for settlement and for trial and evaluating cases involving equitable remedies.

Mr. Apolinsky's practice also includes non-tax dispute work, such as, for example, disputes among family members over inheritances, disputes between children of a first marriage and a surviving spouse, and arguments among families where some family members own and work for a family business and others do not own and work there.

Mr. Apolinsky has acted as a mediator and an arbitrator. He successfully mediated a tax case in which the government was represented by the Department of Justice and had accepted him as a mediator.

Mr. Apolinsky taught estate and gift tax courses and estate planning courses for 24 years at the University of Alabama School of Law and for 28 years at Cumberland School of Law. He has authored publications involving the drafting of buy/sell agreements.

The Court finds that Mr. Apolinsky who, having practiced and taught estate and gift tax law, having extensive experience in the resolution of both tax and non-tax disputes, and having expertise as a mediator, is qualified to render his opinion as an expert for purposes of this case.

Mr. Apolinsky began his analysis with the $16,643,158.00 amount he calculated that the IRS was seeking from the transferees at Mrs. O'Neal's death. This amount consisted of $7,236,238.00 in underpayment of gift and generation-skipping transfer tax, $2,170,898.00 in penalties, and $7,235,932.00 in interest to the date of Mrs. O'Neal's death. He then applied three approaches, which he labeled as the specific approach, the general approach, and the blended approach.

The specific approach included an analysis of the 1951 Buy-Sell Agreement, the expert appraisal reports, the marketability reports, and relevant settlement offers. He did not attempt to appraise the gifted stock. Instead, Mr. Apolinsky examined the methodologies of the appraisers, the comparisons to other companies, the weighting between book value and earnings valuations, and the discounts in order to determine what a court most likely would do in a similar situation. Based on this analysis, he opined that a court would likely hold that the value of the O'Neal Steel Class A non-voting common stock was $291 00 per share and

that the value of the O'Neal Steel Class B voting common stock was $306.00 per share as of November 3, 1987.

Under the general approach, Mr. Apolinsky used a valuation matrix to analyze the IRS's success in litigating transfer tax values determined in its notices of deficiency and he concluded that the IRS's success ratio was approximately 60% in cases involving closely-held businesses. Applying the likely 60% success factor, a person evaluating the Tax Court Cases would have considered the value of the O'Neal Steel Class A non-voting common stock to have been $223.00 per share and the value of the O'Neal Steel Class B voting common stock to have been $247.00 per share as of November 3, 1987.

The blended approach combined the values derived through the specific approach and the general approach to reach a final opinion on the proper gift tax value of the stock. It results in a value of the O'Neal Steel Class A non-voting common stock of $257.00 per share and the O'Neal Steel Class B voting common stock of $277.00 per share.

Based on the blended approach values, Mr. Apolinsky calculated a $4,379,059.00 underpayment of gift tax with respect to Mrs. O'Neal's 1987 gift tax return. The $4,379,059.00 underpayment would result in a $1,313,718.00 penalty under 26 U.S.C. § 6660. The interest through Mrs. O'Neal's date of death would have been $4,245,025.00, resulting in an aggregate transferee liability of $9,937,802.00. However, Mr. Apolinsky reduced the interest amount by $262,663.00 to take into account the possible application of *Poinier v. Commissioner*, 86 T.C. (CCH) 478, 489 (1986), *rev'd*, 858 F.2d 917, 920 (3d Cir.

1988), and *Baptiste v. Commissioner*, 29 F.3d 433, 438 (8th Cir. 1994),[13] to the computation of transferee interest, resulting in a transferee liability of $9,675,139.00.

The Court notes that the conclusions of both Judge Pointer and Mr. Apolinsky as to the likely outcome of the transferee tax litigation as of Mrs. O'Neal's date of death are not dissimilar, even though they were determined independently. The $1,895,139.00 differential between their conclusions is slightly more than 11% of the $16,643,158.00 amount that the IRS was seeking when Mrs. O'Neal died.  For both Judge Pointer and Mr. Apolinsky to independently reach conclusions within 11% of each other is evidence supporting each of their opinions.

Mr. Apolinsky next analyzed the hazards of litigation involved in the children's and grandchildren's restitution claims against Mrs. O'Neal or her estate. After evaluating the law related to the liability for claims, Mr. Apolinsky concluded, like Judge Pointer, that the transferees had a high likelihood of success on the merits.  Mr. Apolinsky concluded that a 20% discount should be applied to account for the hazards of litigation.  Applying this discount, Mr. Apolinsky opined that the value of the children's and grandchildren's claims as of the date of Mrs. O'Neal's death was $7,700,000.00 (rounded).

Again, it is compelling that both Judge Pointer and Mr. Apolinsky concluded that the children's and grandchildren's restitution claims had a high likelihood of success had they been decided on the day Mrs. O'Neal died. Judge Pointer and Mr. Apolinsky, independent

---

[13] The Eleventh Circuit's decision in the related case of *Baptiste v. Commissioner*, 29 F.3d 1533 (11th Cir. 1994), was not considered because it was not rendered until after Mrs. O'Neal died and, thus, would not have been available to the parties to value the claims.

of each other, reached conclusions regarding the probability of success that, when expressed as percentages, differ by only 5%.

The Court finds that the methodologies used by both Judge Pointer and Mr. Apolinsky are consistent with the way cases are analyzed by lawyers for settlement purposes and for trial and are accepted methods for evaluating cases for settlement and for trial.

In addition to the reports and testimony of the expert witnesses, other evidence indicates that the value of the children's and grandchildren's claims was as least as great as Judge Pointer's opinion as to the value. When Mrs. O'Neal died, the IRS was seeking in excess of $16,000,000.00 from the children and the grandchildren. Just three months prior to Mrs. O'Neal's death, the Tax Court had ruled against the grandchildren on the question of whether they were liable as transferees. Under Rev. Rul. 59-60, 1959-1 C.B 237, the values in the 1951 Buy-Sell Agreement were not binding for gift tax valuation purposes. Not only did the IRS already have Mr. Kaye available to testify in support of the values it had determined, the IRS had engaged a second valuation expert shortly before Mrs. O'Neal's death. In support of Mr. Kaye's valuation, the IRS stated in response to the grandchildren's discovery in the Tax Court Cases that the values asserted in the Notices of Liability were greatly discounted. In response to questions from the Court during trial, Mr. Breen reaffirmed the IRS' discovery response by testifying there was "a big discount, greatly." This testimony was not contradicted.

In contrast, the grandchildren's defense in the Tax Court Cases at the time of Mrs. O'Neal's death was grounded in three marketability opinions, all of which relied on the 1951

Buy-Sell Agreement, and not one of which was prepared by someone identified as an expert in the valuation of the stock of closely-held corporations or was prepared in accordance with the Uniform Standards of Professional Appraisal Practice.

Further, the findings contained in the Notices of Liability were presumed in the Tax Court Cases to be correct, and the burden of proof was on the grandchildren to prove to the Tax Court that the findings were erroneous. TAX CT. R. PRACTICE AND PROCEDURE 142(a); *Helvering v. Taylor*, 293 U.S. 507, 514 (1935); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Lucas v. Kansas City Structural Steel Co.*, 281 U.S. 264, 271 (1930). The failure of a taxpayer in the Tax Court to carry the burden of proof results in judgment for the IRS in the amount in the notice of deficiency or liability, even if the Tax Court ultimately rejects the IRS's expert. *Anselmo v. Commissioner*, 80 T.C. 872, 886 (1983), *aff'd,* 757 F.2d 1208 (11th Cir. 1985). Thus, if the grandchildren failed to carry their burden of proof in the Tax Court Cases, judgment would have been entered for the IRS even if Mr. Kaye's valuation was rejected.

In remanding this case, the Court of Appeals instructed this Court to determine a sound valuation "using informed judgment, reasonableness and common sense, weighing all relevant facts and evaluating their aggregate significance." 258 F.3d at 1275. Like both Judge Pointer and Mr. Apolinsky, informed judgment, reasonableness and common sense tell this Court that, when faced with potential transferee liability in excess of $16,000,000.00 as of the date of Mrs. O'Neal's death, the value of the children's and grandchildren's restitution

claims on that date was *at least* as great as the $5,835,000.00 value determined by Judge Pointer.

With respect to the opinions of both expert witnesses, the Court concludes that Judge Pointer's opinion is more persuasive.   Since the issue before the Court involves determinations of the likely outcome of litigation in the Tax Court and litigation of a claim for restitution, the Court places great weight on the experience of Judge Pointer who spent twenty-nine and one-half years on the federal bench resolving cases, many of which were of a similar nature.  Moreover, having reviewed the exhibits offered into evidence and having heard the testimony of the witnesses, particularly the testimony of the lead attorneys for the parties in the Tax Court Cases, the Court has reached the same conclusion as Judge Pointer. The value of the children's and grandchildren's claims as of Mrs. O'Neal's date of death is $5,835,000.00.

While the value of the claims is $5,835,000.00, the amount of the deduction under 26 U.S.C. § 2053(a)(3) is less.  26 U.S.C. § 2053(c)(2) disallows a deduction for amounts described in 26 U.S.C. § 2053(a) to the extent that the amounts exceed the value as of the decedent's death of the property subject to claims (except to the extent that the deductions represent amounts paid before the date for filing the estate tax return). In this case, the value of Mrs. O'Neal's property that was subject to claims as of the date of her death was $5,303,744.00, and the amount of the deductions under 26 U.S.C. § 2053(a) cannot exceed this amount.

CONCLUSION

The Court finds that the value of the children's and grandchildren's claims as of Mrs. O'Neal's date of death was $5,835,000.00. The Court further finds that the amount of the deduction allowed to Mrs. O'Neal's Estate for the children's and grandchildren's claims is limited by 26 U.S.C. § 2053(c)(2) to $5,303,744.00. Since the deduction for the children's and grandchildren's claims reduces the taxable estate to zero, the Court finds that the full amount of the estate taxes paid by Mrs. O'Neal's Estate, together with interest as provided by law, is due to be refunded.[14]

A separate order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this the _31_ day of _July_____, 2002.

_____
INGE P. JOHNSON
UNITED STATES DISTRICT JUDGE

---

[14] The decision of the Court of Appeals also addressed an administration expense deduction under 26 U.S.C. § 2053(a)(2) for interest accruing on the estate's unpaid estate tax liability. This Court was instructed to recalculate the amount of the interest deduction at the conclusion of all litigation. 258 F.3d at 1277. Inasmuch as this Court has determined that Mrs. O'Neal's Estate is entitled to a refund of all estate taxes paid by Mrs. O'Neal's Estate, there are no unpaid estate taxes and no interest is owed. This issue is moot and need not be addressed further.